[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] C.G.S. SECTION 8-132 REPORT — REVISED STATEMENT OF COMPENSATION
The condemner is a municipal agency created pursuant to General Statutes § 8124, et sec.
The certificate of taking was issued by the clerk, Superior Court, Judicial District of New Haven on December 7, 1998.
On February 1, 1999, Bertha Norback filed her "Appeal and Application For Review of Statement of Compensation Condemnation."
Both attorneys stipulated that she is the only party in interest and only applicant, as owner in fee simple, to this court for a review of the statement of compensation.
On April 23, 1999, a motion for payment of deposit was granted (Mulvey, JTR) and disbursements made as follows: $724.53 Collector of Taxes West Haven and $299,275.47 Bertha Norback — Total $300,000.00.
In her appeal and application she alleges and testified that she is the only owner of the premises set forth in Exhibit A annexed to her appeal and that she is aggrieved by the statement of compensation. (Copy of Exhibit A attached hereto).
The court viewed and walked the subject property in the company of both attorneys during mid-week and early mid-morning traffic hours. Testimony deemed material was taken.
Section 8-132 authorizes appointment of a state referee to make a review of the statement of compensation.
Section 8-132 also mandates a detailed statement of findings sufficient to enable the court to determine the considerations upon which the referee based his conclusions.
Subject property fronts on Saw Mill Road identified in part as lots 39 and 40. Two additional lots identified as lots 41 and 42 are bound in part by the rear of 39 and 40. No other or alternative access or egress services 41 and 42 lots. Absent 39 and 40 it is inaccessible.
The property is located in a "Commercial Planned Development" District authorizing flexibility for varied commercial and retail development to CT Page 1702 all 84 acres of the redevelopment area.
Lots 39 and 40 front on Saw Mill Road and are identically shaped. They are rectangular and measure 77 feet by 583 feet. Each comprise approximately one acre. The two rear lots 41 and 42 taken together form a square approximately 250 feet by 250 feet, a total of 1.61 acres.
Lots 39 and 40 parcels consisted of abandoned and unoccupied structures as of the date of taking, in significant disrepair, of no value and said structure had to be demolished. Lots 39 and 40 rise from Saw Mill Road to their rear boundary to a total 54 foot rise. The grade of the hill consists of bed rock over the lower front half of lots 39 and 40, under approximately 5.9 feet of topsoil, require additional site costs to develop, depending on type of use intended, between $300,000 and $500,000 estimated.
There is a sharp drop off east of lot 40.
There was no evidence of any recorded use of lots 41 and 42.
The total frontage of lots 39 and 40 on Saw Mill Road is 153 feet. Zoning regulations require 25 feet side yards. Further restrictions to be considered are mandated by the American With Disabilities Act.
At the time of the taking both parcels were largely wooded with overgrown brush and woods. Lots 39 and 40 were on a steep grade with limited frontage, consisting of bed rock consistently beneath the top soil. This irregularity of shape of the two parcels, limited access and egress, narrowness, topography and the distance of lots 41 and 42 from the street make many permissible zoning uses the subject of economic feasability. The one viable use would be a strip mall, i.e., a series of retail stores staggered up the hillside, running sideways, and extended over and into lots 41 and 42.
The highest and best use of the property would be for commercial and retail purposes. This Redevelopment Plan encompasses some 84 acres predicated on a finding that existing and future substandard, unsanitary, deteriorating, slum or blighted areas constitute a serious and growing menace, injurious and inimical to the public health, safety, morals and welfare of the former residences.
The surrounding area and neighborhood consisted of blighted and deteriorated structures within the redevelopment zone in significant disrepair and in need of demolition viz six condemned apartment buildings, a six unit condominium, an abandoned nursing home, boarded up and in disuse, a three-story apartment building that a bank foreclosed CT Page 1703 on, and boarded up, plus several buildings and condominiums within 200 or 300 feet that have numerous code violations, having been abandoned or were in an extreme state of disrepair.
The appraisal report of the City advances two main theories: (1) sale of superior comparability, and (2) that his appraisal appropriately adjusts the value of the property by designating lots 41 and 42 as "excess acreage."
In this factual situation comparable sales presented by the City as evidence for the court's consideration and conclusion were seriously evaluated by the court. The second or "excess acreage" theory is based on facts that are not in dispute. Testimony established evidence of Costco's large retail shopping outlet in Orange or Milford with limited frontage on U.S. #1 and a substantial parking and service area to the easterly rear area. Highly profitable.
The same witness presented testimony and evidence of another large retail shopping outlet in Branford and limited frontage on U.S. #1 and a substantial parking and service area to the easterly rear area called Wal-Mart. Also highly profitable.
Lots 41 and 42 in spite of their limited access and egress have high value. Lots 39 and 40 provide that availability.
Section 8-129 provides that upon recording of the certificate of taking in the office of the town clerk of each town where the property is located "the right to just compensation shall rest in the person entitledthereto." The court considers all elements and factors in evidence influencing the fair market value of the land which legitimately affect value.
Important factors to be considered by a potential purchaser are zoning regulations. Subject regulations relative to this Commercial Planned Development district give flexibility for varied commercial and retail development to the acres that compromise this zoning district because of its geography and its location on Saw Mill Road and proximity to I-95. Permitted uses are expansive and numerous.
The City maintains subject property is limited in its development potential in topography and as to speculative and opinionated cost of development. City witnesses agreed with each other that lots 41 and 42 (the rear 1.61 acres or approximately forty-five percent (45%) of the property) was non-developable or so called "excess" land with no feasible worth. Evidence as to the cost of developing subject land, the cost of developing a great retaining wall, would not be economically worth it. CT Page 1704 The City notes the side set back requirement of 50 feet would restrict the lots 39 and 40 parcel of retail uses. Witnesses for the condemnee proved lots 41 and 42 could be developed and serviced as to access and egressed over 39 and 40 also while providing retail outlets.
The condemnee presented three expert witnesses plus her appraiser to give testimony pertinent to issues of grade, side set back concerns, and the development potential and costs of utilizing the entire 3.61 acres.
James Galligan, president of an area consulting engineering firm is a Connecticut registered professional engineer who prepares plans and specifications for site development and excavation of properties. He regularly advises private developers and municipalities on the capability of property to be developed, including assessment of the physical characteristic of the parcel, its location, terrain grading and soil.
After considering the features of subject property he stated his expert opinion that the proper development would be a series of smaller commercial buildings rising up the slope facing each other having two floors, terracing the property and providing access and egress to Saw Mill Road.
The side set back of 25 feet would conveniently be utilized for the access road. The total cost of development to the property, including grading for the slopes, pavement, drainage, including structures and piping would be, if flat as a pancake, $230,000, or $300,000. Mr. Galligan further testified that the average slope of the property of six and one-half percent (6 1/2) would not cause any problem in developing the property. He concluded that the development would pretty much mirror the property as it stands today and the standard building foundation would sufficiently act as a retaining wall without any additional support in contrast to the City's consternation that one would have to construct a "great retaining wall": this same type of development could continue and follow through with the rear portion of 1.61 acres, i.e., lots 41 and 42.
The condemnee's second expert witness opined with regard to the feasibility of developing subject property for retail and commercial development and praised its access to Saw Mill Road, to both north and southbound I-95, its connection through U.S. #1 and attraction views of Long Island Sound. Jeffrey Gordon's background is as a land use planner and licensed landscape architect, a consultant used by various municipal and federal agencies and developers for land use planning and issues involving highest and best use to which property may be put. He has experience in commercial, industrial, institutional, residential and CT Page 1705 various types of property development. He served as a planner for the New Haven Redevelopment Agency and as an expert witness for the City of West Haven in the defense of its redevelopment along the waterfront.
He corroborated Mr. Galligan's testimony that six and one-half percent (6 1/2) slope from front to back was not a problem and that terracing the buildings would allow the use of the buildings own foundation as a retaining wall. This would be utilizing the design to work with the land. Parking and desirable office space in view of the available main road arteries enhance this location for development.
He considered many possibilities if considered as something contiguous to or part of the utilization of a large parcel. He considered it as "a stand alone" parcel worth "somewhere in the three to four hundred dollars an acre range."
Lawrence Frederick Johnson, a professional geotechnical engineer is a consultant to developers, contractors, and other engineers regarding soil evaluations, and ground water conditions on sites proposed for development. Based on his research and investigation of the property and after the taking of various test boring he found the estimate value (after deducting or the cost of excavating and loading) of sand and gravel on the property was $189,251.00.
The Memorandum of the City of West Haven dated January 10, 2001 recites adoption of Redevelopment Plan pursuant to General States § 8-124 et sec. following a finding of "Blightedness" which is a condition precedent to the bringing of an eminent domain for such "public" purposes.
Documentary evidence of compliance with legal requirements may be offered and considered if the "purposes" is in dispute.
The highest and best use of subject property is for retail development given the zoning that's in place, the traffic count, surrounding uses, and close proximity to the highways. This location is the key element making it a viable site.
The valuation opinions of the appraisers are $1,256,000, condemnee and $300,000, condemner. Both appraisers used comparable sales as a basis for their opinions. This wide difference of opinions results from condemnee's considerations attributed to this location as viable site and as above noted, located next to this planned major development.
After weighing all the evidence as to just compensation for the taking plus reasonably probable use and development of the plan the court finds the fair market value of this subject property to be $300,000 per acre. CT Page 1706
A state referee sitting as a court on appeal in condemnation cases is more than just a trier of fact or an arbitrator of differing opinions of witnesses. He is charged by the General Statutes and the decisions of our courts with the duty of making an independent determination of value and fair compensation in the light of all circumstances, the evidence, his general knowledge and his viewing of the premises. Minicucci v.Commissioner of Transportation, 211 Conn. 383, 388 (1989). It is his task to reach a result that gives the plaintiff as nearly as possible, a fair equivalent in money as just compensation for the property taken. Mathisv. Redevelopment Agency, 165 Conn. 622, 623 (1973).
 Value of 3.61 acres of land taken on 12/7/98 at $300,000 an acre $1,083,000 Less sand and gravel remaining 189,000 Revised compensation 894,000 Disbursed to condemnee 300,000
Revised statement of compensation $ 594,000
Appraisal fee $4,000 plus interest from 12/7/98, plus taxable costs.
Reynolds, J.T.R.
 EXHIBIT A
All that certain piece or parcel of land, with all the improvements thereon, known as 585-593 Saw Mill Road situated in the Town of West Haven, and being a portion of Plot #1 and all of Plot #2 on a map of the property of Vincenzo Piscitelli and Rosa Piscitelli made by John F. Lynch, Registered Engineer, scale 1 inch equals 100 feet, dated March 1939, on file in the West Haven Town Clerk's office, and also known as lots #39, 40, 41 and 42 on a tax map of the City of West Haven, New Haven County, Connecticut, prepared by James W. Sewall Company, Oldtown, Maine, dated October 1, 1989 and revised May 1, 1997 and on file in the tax assessor's office in the West Haven Tax Assessor, said premises being bounded:
South by Saw Mill Road, 153.59 feet, more or less;
 West by 668.25 feet, more or less, along the boundary of land now or formerly belonging to St. Louis Church and lot 39 of the tax map of the City of West Haven;
 North by 33.67 feet, more or less, along the corner boundaries of land now or formerly belonging to St. Louis Church and lots 39 and 41 of the tax map of the CT Page 1707 City of West Haven;
 West again by 226 feet, more or less, along the boundaries of land now or formerly belonging to St. Louis Church and lots 41 and 42 of the tax map of the City of West Haven;
 North again, by 290 feet, more or less, along the boundary of land now or formerly belonging to the City of West Haven and lot 42 of the tax map of the City of West Haven;
 East by the boundaries of lots 41, 42, 50 and 51 of the tax map of the City of West Haven, by 296.65 feet, more or less; South again, along the boundaries of lot 41 and land now or formerly belonging to Daniel J. Maffeo, Jr., also identified at lot 45 of the tax map of the City of West Haven, by 155.08 feet, more or less; and
 East again, by lot 43 and land now or formerly belonging to Daniel J. Maffeo, Jr., also identified at lot 45 on the tax map of the City of West Haven, by 583.24 feet, more or less.